GAY LIB et al., Plaintiffs,

v.

The UNIVERSITY OF MISSOURI et al., Defendants.

Civ. A. No. 74 CV 53 C.

United States District Court,
W. D. Missouri, C. D.

June 29, 1976.

Lawrence P. Kaplan, Clayton, Mo., for plaintiffs.

James S. Newberry, Columbia, Mo., for defendants.

## FINDINGS AND OPINION

ELMO B. HUNTER, District Judge.

Presented to the Court in the context of this case is the question of the legal right of homosexuals to form a student organization and obtain University recognition of it as a campus organization.

### History and Facts of the Case

February 25, 1971, marks the beginning of an attempt on the part of a small group calling itself Gay Lib to gain formal recognition as a student organization at the University of Missouri at Columbia, Missouri. On that date, Gay Lib submitted three documents to the .Missouri Students Association (hereinafter referred to as the MSA): (1) a petition for recognition on the forms provided for that purpose by the MSA, (2) a proposed constitution and by-laws, and (3) a statement of the purposes of the proposed

organization.[1] Gay Lib's application for recognition was given initial consideration by the Rules Committee of the MSA Senate, which approved it and recommended that the MSA Senate also grant approval. The MSA Senate did so and forwarded the petition and accompanying documents to the Committee on Student Organizations, Government and Activities (hereinafter referred to as SOGA), made up of both faculty members of the University and students.

For reasons not pertinent to this litigation SOGA did not take immediate action on the Gay Lib petition. On November 22, 1971, during the period that its petition was before SOGA but not yet under active consideration, Gay Lib submitted a revised statement of purposes[2] which added detail to the initial brief statement.

On December 22, 1971, SOGA voted 8–5 in favor of recommending approval of Gay Lib as a recognized student organization.[3] A subcommittee of SOGA members was appointed to assist the Dean of Student Affairs, who was responsible for the next step in the recognition procedure, in implementing the SOGA recommendation.

Edwin Hutchins, then Dean of Student Affairs, vetoed SOGA's recommendation of approval on February 1, 1972, in a letter to Dr. Ray Lansford, SOGA Chairman. Dean Hutchins' letter was the initial step in what became a continuing refusal by the University to recognize Gay Lib as a student or-

1. "The purpose of the organization Gay Lib shall be:
 (a) To provide a dialogue between the homosexual and heterosexual members of the university community.
 (b) To dispel the lack of information and develop an understanding of the homosexual at the University of Missouri.
 (c) To alleviate the unnecessary burden of shame felt by the local homosexual population.
 (d) To help education, the community and the homosexual to understand the social roles that the homosexual now plays in the community.
 (e) To work closely with established university and community groups for a broader sharing of knowledge and information."

2. The revised Gay Lib statement of purpose provided:
 "1. Gay Lib intends to create a forum for the study of the sexual statutes of this state and especially of the sodomy law now in effect. Through study of the intent of the law and of its psychological and sociological implications, it will be possible to more fully understand what the full meaning is of being gay. Through knowledge of the law, it becomes possible to create an atmosphere within which the present statute may be revised or eliminated through an educational and candid look at all ramifications of such laws and their rationale. Changes of other such laws outside of Missouri and in nations such as Great Britain will provide a fuller context.
 "2. Gay Lib seeks to promote meaningful communication between all members of the University community, whether homosexual or heterosexual. With candor and compassion on both sides, much of the fear of the unknown can be eliminated and scars of past repression may be healed. This communication is specifically intended to be two-way in nature. The gay world has just as much to learn from the straight world as they have to offer it. We seek to develop an atmosphere in which people are themselves first and sexual entities second.
 "3. Gay Lib wants to provide information to the vast majority of those who really don't know what homosexuality or bisexual behavior is. Too much of the same prejudice is now directed at gay people just as it is directed at ethnic minorities.
 "4. Gay Lib does not seek to proselytize, convert, or recruit. On the other hand, people who have already established a pattern of homosexuality when they enter college must adjust to this fact.
 "5. Gay Lib hopes to help the gay community to rid itself of its subconscious burden of guilt. Society imprints this self-image on homosexuals and makes adjustment with the straight world more difficult.
 "6. Gay Lib hopes to function as a channel for those who find difficulty in sexual adjustment. While we do not pretend to have psychiatric expertise, we can reach people who do not trust normal channels for such help and enable them to contact professional help as required.
 "7. As an educational group, Gay Lib does not advocate any violation of state statutes. We serve as a forum for understanding and knowledge where this is now lacking."

3. The five dissenting voters, who were all faculty members, submitted a minority report as follows: "A minority disapproves of giving official recognition to the Gay Liberation Organization. This disapproval is based upon the belief that recognition will damage the image of the University of Missouri-Columbia. Recognition gives tacit approval to all that Gay Liberation may stand for irrespective of whether the organization is legal or illegal."

ganization. Subsequent decisions at higher levels in the University not to recognize Gay Lib were based largely on Dean Hutchins' veto and its reasoning. The clear significance of this letter, therefore, requires that its lengthy text be fully set forth.

"Dear Dr. Lansford:

"On December 22, 1971, the University Committee on Student Organizations, Government and Activities, meeting in regular session, passed and submitted to me a motion calling for the approval of Gay Lib as a recognized student organization. While I did respond to this resolution at that time, I indicated that at the next regular meeting I would like to present a formal statement regarding my administrative response to this recommendation. There are a number of considerations which I feel should be stated and made a part of the record of the Committee on Student Organizations, Government and Activities.

"The statement of purpose and the organizational structure of the Gay Lib organization are a matter of record in the minutes of the SOGA committee. When recognition of this organization was first requested, after having received a positive recommendation from the Missouri Students Association, the SOGA Committee then undertook to consider the implications of recognition for the general University community and addressed itself to three areas; legal considerations, a concern for the psychological impact on individual students, and a concern for the impact of recognition on the general relationship of the University to the public at large. In my opinion, sufficient time and energy of the concerned parties, members of the committee, and the committee as a whole, were addressed to the first two issues.

"With regard to concerns for the legality of such an organization, no evidence was presented to the committee nor has any come to my attention that would indicate that legal grounds exist for not recognizing the group based upon its stated purpose and objectives. The very essence of the group in their stated purpose is to study the legal and social position of the state vis-a-vis the issue of homosexuality, an issue considered to be of vital concern to a small proportion of our student body and of concern generally in terms of social attitudes and social response. Study of social issues in a manner which will bring light to bear in areas where society has heretofore been poorly informed is compatible with the general objectives of a University. Nevertheless, simply because we are not legally precluded from taking a specific action does not, to my thinking, represent sufficient grounds for doing so. I, therefore, set aside questions of legality as a basis for my response to this recommendation.

"In my opinion, the committee appropriately raised issues concerning the impact on our campus of such a group as a formally recognized entity. In this regard we must maintain a vital concern for the psychological well being of all our students and specifically those students who, during this period of their growth and development, may, from time to time, be concerned about their own psychosexual problems. On the one hand, recognition of a formal group could conceivably exacerbate such problems and lead to personal and psychological stress for individual students who may be concerned about their sexual identity. On the other hand, the existence of such an organization could conceivably contribute in a productive manner to the development of an atmosphere which would allow students to seek help in dealing with what are, for many, relatively normal kinds of concerns. It is equally conceivable that a forthright and open examination of social response to such individual concerns could be helpful and productive. Having been privileged to hear the discussion between the committee and qualified experts in the fields of medicine and psychology, I am convinced that the issues revolving around the concern for the psychological well being of our students were thoroughly developed and that an enlightened rationale for addressing ourselves to the issue was presented. This has not always been the case in this University with its unique and difficult histo-

ry in this problem area. If we do not wish to move backward in time, we must be sensitive to the history of our response to this issue and the reasons for it. This, too, was well developed in committee discussion. Since the statement of purpose of the group seeking recognition should be a basis for committee consideration and the purposes and intent of the group are well stated relative to this issue, the psychological issues which were explored did not appear to form grounds for rejection of the request.

"While we must always keep before us the ideal of a university as an independent, rational, and deliberative body within society, we must recognize as well that the University does not operate independent of the social system that supports it. It is simultaneously cast in the role of a leader in the development of social thought and values and is at the same time an instrument for the transmission of social mores. When we are to determine recognition as a part of the formal university family of an organization whose basic purpose is the study and advocacy of social change in an area of high social sensitivity, we find these two themes in conflict. How we resolve this conflict, what the appropriate University role is, and how we can best develop a positive position are matters that I feel were not thoroughly dealt with in the generation of the recommendation for action on this group.

"In addition to the above major concerns, there are secondary considerations which demand attention. First, the specific history relative to the problems of homosexuality that is unique to this University represents a point of departure for any specific discussion. We cannot in our collaborative decision making ignore in this, or any other issue, the fact that there are certain unique characteristics of our own institution. This is especially important with regard to the questions raised here because the University has not had a comfortable history in this area. A second concern on any issue so complex and sensitive that it raises questions about extreme costs to the institution, has to do with our total decision making process. Unless I am willing as chief student personnel officer to assume decision making responsibility in areas of student concern, we can expect that time and time again the decision making process will drift from a level close to students and their welfare to an abstract level where day to day student concerns cannot have the appropriate attention that those of us who interact directly with the students might hope to render. For this reason, I did undertake to assume direct responsibility relative to this matter. While such assumption of responsibility is not necessarily palatable to me a concern for the development of our total decision processes made it imperative that I do this. A third consideration deals with the time-table for committee deliberations and decisions. I do not feel that all of the basic issues were sufficiently discussed by the committee. I am concerned that the committee resolution was passed under a time press not compatible with deliberate development of such a complex issue.

"All of the above considerations were thoroughly manipulated in seeking a basis for decision on the matter at hand. Two matters were of primary concern in the decision reached. First, the very strength of the Committee on Student Organizations, Government and activities lies in the fact that it represents all the major facets of the University community. This committee must rise in its deliberations to a level of statesmanship that represents the University's total well being. As a faculty-student committee, SOGA must serve the general well being of the University community. It will serve us well when its develops fully the capacity to find solutions that a common ground where all of the advantages and disadvantages to the University are considered in broad perspective. I do not at this point in time presume to have a monopoly on the wisdom which I ask of the committee in deliberating on this complex matter. But I do not feel in its deliberations that the committee complet-

ed its task. It is only with regret and reluctance that I would, at any time, overrule a faculty-student committee recommendation which has been arrived at in due fashion. In this matter, I point to the existence of a minority report and to the fact that there was pressure to operate in a time frame that I do not consider compatible with the total best interests of the University and I, therefore, cannot concur in the recommendation sent forward.

"This negative response to the committee recommendation should in no way be construed as an interpretation that we do not have an issue of importance presented to us, that this is not an area of concern to our students or that such issues will not appear as agenda items in the future. But at this juncture I do not feel that the committee recommendation, lacking as it does the full support of the committee, is one timely for the University."

Shortly after Dean Hutchins' veto, the MSA Senate established a Committee on Sexual Freedom. The "chairone" of this Committee was Lawrence Eggleston, who had also been one of the prime movers behind the Gay Lib application for recognition. The Committee on Sexual Freedom held weekly meetings with rather sparse attendance for the purpose of discussing sexuality. At one such meeting assistant prosecutors from Boone County and Columbia spoke on the impact of law on homosexuals. In late spring 1972, the Committee on Sexual Freedom applied for funding from the MSA budget. The MSA Senate passed a bill endorsing the Committee on Sexual Freedom and approving funding of $25.00 for a subscription to *The Advocate*, a national homophile paper. The funding approved by the MSA Senate never culminated in the receipt of money by the Committee on Sexual Freedom. On December 6, 1972, Edward Thelen, who had replaced Edwin Hutchins as Dean of Student Affairs, sent a memo to Dave Markee, Director of Student Life, expressing his belief that the Committee on Sexual Freedom was a "subterfuge for accomplishing the recognition (of Gay Lib) vetoed by Dean Hutchins" and directing Markee to refuse to act on requests from the Committee on Sexual Freedom. Lawrence Eggleston unsuccessfully appealed Dean Thelen's position on the Committee on Sexual Freedom to Chancellor Schooling.

On January 22, 1973, the issue of Gay Lib recognition began its way up the hierarchy of appeals within the University system. On that date, the Gay Lib Executive Board asked Dean Thelen to reconsider his predecessor's veto decision of February 1, 1972.[4] Dean Thelen chose to uphold Dean Hutchins' veto.[5] Dean Thelen's decision was appealed to Chancellor Schooling, who on February 28, 1973, upheld it on the grounds that "it would not be in the best interests of the University to extend such recognition." Next in the line of appeal came C. Brice Ratchford, President of the University of

---

4. Despite the lapse of almost one full year since Dean Hutchins' veto of Gay Lib recognition, neither Gay Lib nor the University indicated during the ensuing series of appeals that the issue of Gay Lib recognition was moot or untimely. Appeals were pursued by Gay Lib and processed by the University with the sort of close attention that makes it clear that both parties considered the issue a live one, despite the Committee on Sexual Freedom hiatus. Nothing in the record before this Court indicates that the University could not have refused Gay Lib's appeal on recognition as untimely and required that the group begin the recognition process again from the beginning. The University, however, chose to allow Gay Lib to appeal the almost one year old decision of an administrator no longer holding the position of Dean of Student Affairs. Therefore, allusions in the University's brief to the mootness of the issue of Gay Lib recognition because of the lapse between the original veto and the first appeal are not, at this late date, well taken.

5. "It is my opinion that Dr. Hutchins' judgment regarding probable public reaction to the recognition of Gay Liberation as a student organization was accurate and worthy of consideration. The University has many publics to serve, and each must be considered when making decisions of this sort. It is my belief that a decision to recognize Gay Liberation is not in the best interests of the total University, and that the damage to the University that could accrue from such a decision outweighs the benefits that might be achieved."

Missouri. He concurred fully with the decisions of those below him.[6]

President Ratchford's decision was appealed to the Board of Curators of the University of Missouri. There was before the Board at this time an appeal on the same issue from the Gay People's Union at the University of Missouri-Kansas City. The Board, therefore, consolidated the appeals from both campuses and referred the matter to its Academic Affairs Committee. This Committee appointed Mr. Cullen Coil, a very able Jefferson City attorney and former Commissioner of the Supreme Court of Missouri, as a hearing officer and directed him to hold a consolidated hearing to develop the facts involving both the Columbia and Kansas City situations. Following notice to the parties on June 21, 1973, Mr. Coil held a hearing on August 13, 1973, on the Gay Lib request for recognition at the University of Missouri at Columbia.

The 290 page transcript of the August 13, 1973, hearing reveals that both the University and Gay Lib adduced a wide range of evidence on three main issues:

(1) the procedural steps taken by Gay Lib to gain recognition at the University of Missouri at Columbia,

(2) whether homosexuality is normal or abnormal and

(3) whether University recognition of a homosexual organization would produce increased violations of the Missouri Sodomy Law.

There was both lay and expert testimony on such subjects as the history of the Gay Lib movement, whether orgies were standard

homosexual practice, the alleged homosexual propensities of a mass murderer in Houston then much in the news, and the detrimental effects on children of "mothers who are overly protective or hostile and rejecting or clinging." .

Mr. Coil recommended 24 findings of fact on the basis of the August 13 hearing. A majority of his recommended findings involved the proceedings whereby Gay Lib sought recognition at the University of Missouri at Columbia. However, findings 14–25 dealt with the questions of what homosexuality is, the relationship of homosexual practices to the Missouri Sodomy Statute and the potential impact of University recognition of Gay Lib. Mr. Coil concluded that

"formal recognition by the University of Gay Lib will

"(1) give a formal status to and tend to reinforce the personal identities of the homosexual members of those organizations and will perpetuate and expand an abnormal way of life, unless contrary to their intention as stated in their written purposes, the homosexual members make a concerted effort to seek treatment, recognize homosexuality as abnormal and attempt to cease their homosexual practices;

"(2) tend to cause latent or potential homosexuals who become members to become overt homosexuals;

"(3) tend to expand homosexual behavior which will cause increased violations of section 563.230 of the Revised Statutes of Missouri;

---

6. "A review of the purposes of the proposed organization leads me to the conclusion and decision that the purposes are not compatible with the overall educational mission of the University of Missouri and that recognition of an organization with those purposes would not be in the best interest of the University.

"The purposes import an activist role in the Gay Liberation movement. The name itself, "Gay Lib", implies the liberation of homosexuality. These purposes are more than establishing an "understanding and knowledge." They are in fact an attempt to actively promote the

practices of homosexuality by claiming that they are acceptable in our society.

"The organization of Gay Lib by applying for recognition is attempting to obtain the tacit approval of homosexuality by the University of Missouri. Homosexuality is generally treated in the State of Missouri as being a socially repugnant concept as is evidenced by the criminal statutes of the State of Missouri. The University of Missouri protects the rights and freedoms of all members of the educational community but it is felt that non-recognition of an organization promoting such a concept is not an infringement of any rights or freedoms."

"(4) be undesirable insofar as homosexuals will counsel other homosexuals, i. e., the sick and abnormal counseling others who are similarly ill and abnormal; and

"(5) constitute an implied approval by the University of the abnormal homosexual life-style as a normal way of life and would be so understood by many students and other members of the public, even though, and despite the fact that, the University's regulations for student organizations provide that recognition of an organization by the University does not constitute approval or endorsement of the organization's aims or activities."

On November 16, 1973, the Board of Curators of the University of Missouri passed the following resolution.[7]

"Be it hereby resolved that the Board of Curators of the University of Missouri concurs with and hereby adopts the Hearing Officer's Recommended Findings of Fact made by the Honorable Cullen Coil and further makes the following specific findings of fact:

1. The gay lib movement as exemplified by the Gay Lib Organization at UMC and the Gay People's Union at UMKC is premised upon homosexuality being normal behavior, contrary to the further findings herein.

2. A homosexual is one who seeks to satisfy his or her sexual desires by practicing some or all of the following: fellatio, cunnilingus, masturbation, anal eroticism and perhaps in other ways.

3. Homosexuality is a compulsive type of behavior.

4. There are potential or latent homosexuals, i. e. persons who come into adolescence or young adulthood unaware that they have homosexual tendencies, but who have fears of sexual relations with a member of the opposite sex.

5. What happens to a latent or potential homosexual from the standpoint of his environment can cause him to become or not to become a homosexual.

6. That homosexuality is an illness and should and can be treated as such and is clearly abnormal behavior.

7. Certain homosexual practices violate provisions of Section 563.230 of the Revised Statutes of Missouri.

8. That formal recognition by the University of either or both the proposed Gay Lib and Gay People's Union will:"

(The Board of Curators here adopted verbatim Mr. Coil's above-cited conclusions as to the effect of formal recognition.) As a result of this resolution, the instant suit was filed in federal court.

### Status of the Parties

Before the Court can address the constitutional issues of this cause, it must rule on the status and propriety of the parties named as both plaintiffs and defendants. There are five plaintiffs named in the complaint: four individuals and Gay Lib. The individual plaintiffs, all members of the Executive Board of Gay Lib, sue on their own behalves and on behalf of Gay Lib and all members thereof, as a class under Rule 23.2 of the Federal Rules of Civil Procedure. Plaintiffs Napton, Macnamara and Hudson are students at the University of Missouri. Plaintiff Eggleston, formerly a student is now an employee of the University.

---

**7.** Most of the Board of Curator's findings of fact were selected without change from Mr. Coil's recommended findings of fact. The Board of Curator's findings numbered 1 and 3 were, however, composed directly by the Board. Furthermore, Board finding number 6 states only one part of Mr. Coil's recommended finding on this point, which provides in full "There are at least two views held by physicians, particularly by those physicians specializing in psychiatry and psychoanalysis, as to the nature of homosexuality. One view is that homosexuality is an illness and should and can be treated as such and is clearly abnormal behavior. Another view is that homosexuality is not an illness but is only a sexual deviation, described as a mutant or alternative way of expressing human sexuality and is normal behavior."

■ Defendants have moved to drop plaintiff Eggleston from the complaint because he is no longer a student. They contend that because only students may be members of student organizations, Eggleston would not be an adequate class representative and should, therefore, be dropped from the suit. Defendants' motion to drop plaintiff Eggleston is hereby denied for two reasons. First, because this Court will not permit the individually named plaintiffs to sue on behalf of a class under Rule 23.2, the question of Eggleston's adequacy as a class representative is rendered moot. Secondly, although as a non-student Eggleston may not be a "member" of Gay Lib, he may, as a member of the University staff "participate in the activities of student organizations to the extent that he deems proper and its members desire." [8] Heretofore, Eggleston has shown considerable and continuing interest in such participation in Gay Lib. Plaintiff Eggleston may, therefore, join the student plaintiffs in this action, for he asserts a right to relief arising out of the same series of occurrences and this action involves questions of law and fact common to both Eggleston and the other plaintiffs. Federal Rule of Civil Procedure 20(a).

■ Defendants also move to add as plaintiffs all members of Gay Lib, apparently contending that these members are few in number, and so can be named individually to avoid the necessity for a class action. Defendants have not provided the Court with the names of those members whom they desire to add as individual plaintiffs to defeat class certification, but rather suggest that their mere unidentified existence defeats the numerosity requirement for a class action. Defendants' argument in terms of numerosity misconstrues the nature of plaintiffs' proposed class action, however, for plaintiffs seek to proceed under the Rule 23.2 procedure for actions relating to unincorporated associations. Because a showing of numerosity is not required under Rule 23.2 and because defendants have provided the Court with no names of suggested additional plaintiffs, their motion to add parties is hereby denied.

■ An analysis of Rule 23.2 brings this Court to the conclusion that plaintiffs should not be permitted to bring a class suit on behalf of Gay Lib and its members. As indicated above, numerosity is not an element of a class action under Rule 23.2. Rather the purpose of this rule lies in a modern attempt to avoid the common law position that unincorporated associations lacked capacity to sue.[9] Under Rule 17(b), Federal Rules of Civil Procedure, Gay Lib has capacity to bring this action as an unincorporated entity. There is, therefore, no need to allow a class suit under Rule 23.2 on behalf of Gay Lib and its members, because Gay Lib already stands before this Court as an unincorporated association fully competent to represent its own interest, which by definition are the interests of its members. Accordingly, this Court will not certify a class under Rule 23.2 in this action.

The plaintiffs before this Court are, therefore, Lawrence Eggleston, Darrell Napton, Sarah Macnamara, Doug Hudson and Gay Lib, an unincorporated association. Asserting jurisdiction and claims under the First and Fourteenth Amendments to the United States Constitution, Title 28, United States Code, §§ 1343, 2201 and 2202 and Title 42, United States Code, §§ 1981, 1983 and 1988, they seek injunctive and declaratory relief. They name ten defendants: the University of Missouri, Brice Ratchford,[10] President of the University, and eight members of the Board of Curators of the University of Missouri, both individually and as members of the Board.

---

**8.** "M Book", p. 54, 1970–71.

**9.** The Advisory Committee Note to Rule 23.2 provides: "[T]he real or main purpose of this characterization (as a class under Rule 23.2) has been to give 'entity treatment' to the association when for formal reasons it cannot sue or be sued as a jural person under Rule 17(b)."

**10.** Dr. Ratchford within the past month has resigned as President of the University. No suggestion from any party has been made to drop his name as a party or to substitute the name of his successor.

### Causes of Action and Jurisdiction

Plaintiffs' combination of alleged causes of action and jurisdictional allegations must be sorted out and ruled upon before the constitutional merits of this cause can be addressed.[11] In light of the rather convoluted relationship between the various provisions that plaintiffs have relied upon, the Court deems it appropriate to initially discuss the nature of its jurisdictional analysis before considering plaintiffs' specific allegations. First, and most significantly, plaintiffs have chosen to base their entire suit on only one jurisdictional provision; namely, 28 U.S.C. § 1343.[12] Therefore, jurisdiction as to all their proposed causes of action must stand or fall under that statute and not under the more lenient jurisdictional terms of 28 U.S.C. § 1331.

28 U.S.C. § 1343 provides jurisdiction only for actions "authorized by law".

Consequently, each cause of action asserted thereunder must constitute a cause of action created by some other statutory provision. Where a cause of action is not authorized by statute, either because it is not based on a statute at all or because the elements of the statute on which it is based have not been complied with, the result is a lack of jurisdiction under 28 U.S.C. § 1343. Where jurisdiction is invoked under 28 U.S.C. § 1343 alone, failure to state a cause of action upon which relief may be granted (authority by law) requires a dismissal for lack of jurisdiction.[13]

An examination of plaintiffs' specific allegations compels this Court to find that they have failed to state a cause of action upon which relief may be granted under either 42 U.S.C. § 1981 or 42 U.S.C. § 1988. Insofar as 42 U.S.C. § 1981[14] is concerned, the statute itself defines the rights it guarantees in terms of those "enjoyed by white

---

**11.** The Court notes that defendants' sole defense of a jurisdictional nature lies in a motion to dismiss or in the alternative to quash service, which is based upon the contention that not all of the exhibits incorporated by plaintiffs in their complaint were served on defendants along with the complaint. In a motion to strike, however, defendants allege that plaintiffs' complaint, which includes all exhibits, is too lengthy for an appropriate answer. The defendants' pleadings and motions indicate to this Court, as does the very nature of the exhibits in question, which consist of University documents and records, that defendants have been in possession of or had access to the exhibits referred to in the complaint since before this action was instituted. Furthermore, all that the Federal Rules of Civil Procedure require is a short and plain statement of the claim sufficient to give a defendant fair notice of the claim and the grounds upon which it rests. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Therefore, defendants' motion to quash service or dismiss which was taken with the case, is denied. In addition, defendants' motion to strike, which was similarly taken with the case, is also denied. Such motions are not favored and defendants have neither shown that the matters objected to are redundant, immaterial, impertinent or scandalous nor that they lack any possible bearing upon the subject matter of this litigation.

**12.** That portion of 28 U.S.C. § 1343 applicable to the present case provides "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . . (3) To redress the deprivation, under color of any State law, stat-

ute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

**13.** See *Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Prostrollo v. University of South Dakota,* 507 F.2d 775 (8th Cir. 1974). This merits jurisdiction distinction under § 1343 must be distinguished from the usual approach under 28 U.S.C. § 1331. Because § 1331 applies to all suits "arising under the Constitution" and does not require a statutory cause of action, mere allegation of a deprivation of a constitutional right generally confers jurisdiction under § 1331, so long as the jurisdictional amount has been met. *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). After an assertion of jurisdiction under § 1331, the proper judicial action upon finding that plaintiffs have stated no cause of action upon which relief may be granted, is to dismiss the cause on the merits rather than for lack of jurisdiction. The merits/urisdiction distinction is entirely different under § 1343, where a cause of action must be authorized by law and the failure to state a cause of action so authorized also constitutes a failure to invoke jurisdiction. See, 87 *Harv.L.Rev.* 254.

**14.** 42 U.S.C. § 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is

citizens". That this statute was intended to apply to racial discrimination is made clear not only by its unambiguous reference to race but also by the legislative history of the Civil Rights Act of 1866, from which 42 U.S.C. § 1981 is derived in part. According to the United States Supreme Court

"Congress intended (with the Civil Rights Act of 1866) to protect a limited category of rights, specifically defined in terms of racial equality. As originally proposed in the Senate, § 1 of the bill that became the 1866 Act did not contain the phrase 'as is enjoyed by white citizens.' That phrase was later added in committee in the House, apparently to emphasize the racial character of the rights being protected." [15]

This Court concludes that the purpose of 42 U.S.C. § 1981 is to provide a cause of action for racial discrimination only. Plaintiffs in the present case have made no allegation of racial discrimination. Therefore, insofar as plaintiffs seek relief under 42 U.S.C. § 1981, they have failed to state a cause of action. This Court, therefore, lacks jurisdiction over their 42 U.S.C. § 1981 claims under 28 U.S.C. § 1343(3).[16]

Plaintiffs also allege a cause of action under 42 U.S.C. § 1988.[17] However, as stated in *Moor v. County of Alameda*, 411 U.S. 693 at 702, 93 S.Ct. 1785 at 1792, 36 L.Ed.2d 596:

"Section 1988 does not enjoy the independent stature of an 'Act of Congress providing for the protection of. civil rights,' 28 U.S.C. § 1343(4). Rather, as is plain on the face of the statute, the section is intended to complement the various acts which do create federal causes of action for the violation of federal civil rights." [18]

Accordingly, 42 U.S.C. § 1988 could apply in the present case only in association with some other cause of action. Where there is in fact no cause of action, as against all defendants under § 42 U.S.C. § 1981 and against the University of Missouri under 42 U.S.C. § 1983, 42 U.S.C. § 1988 has nothing to complement and is, therefore, inapplicable. Insofar as plaintiffs state a cause of action under § 1983, federal law is suited and sufficient to furnish appropriate remedies and 42 U.S.C. § 1988 is consequently unnecessary.[19] Plaintiffs have thus failed to state a cause of action under 42 U.S.C. § 1988 or associate it with another cause of

enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

**15.** *Georgia v. Rachel*, 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966).

**16.** The Court notes that other courts faced with the issue of whether § 1981 should be construed to apply to nonracial varieties of discrimination have quite consistently chosen to limit § 1981 to causes of action based upon racial discrimination. See *League of Academic Women v. Regents of University of California*, 343 F.Supp. 636 (N.D.Cal.1972) and cases cited therein. The only deviation from this pattern has been the tendency to hold that § 1981 applies to aliens as well as to citizens. See, e. g. *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (5th Cir. 1974), *Roberto v. Hartford Fire Ins. Co.*, 177 F.2d 811 (7th Cir. 1949), cert. denied, 339 U.S. 929, 70 S.Ct. 622, 94 L.Ed. 1343.

**17.** 42 U.S.C. § 1988 reads, in relevant part: "The jurisdiction in civil . . . matters conferred on the district courts by the (Civil Rights Act) . . . ., for the protection of all

persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies . . . ., the common law, as modified and changed by the constitution and statutes of the State wherein the Court having jurisdiction of such civil . . . cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause . . . ."

**18.** *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). The Court cites 42 U.S.C. §§ 1981, 1982, 1983 and 1985 as acts that § 1988 may complement.

**19.** Plaintiffs cite no aspect of state law such as an abrogation of sovereign immunity, that would be of possible benefit to them under § 1988.

action in such a way as to render it applicable here. This Court therefore lacks jurisdiction of plaintiffs' 42 U.S.C. § 1988 claims under 28 U.S.C. § 1343(3).

 Plaintiffs also allege a cause of action under the First and Fourteenth Amendments, presumably in jurisdictional conjunction with 28 U.S.C. § 1343. Plaintiffs' allegations under the First and Fourteenth Amendments clearly suffice to constitute the deprivation of rights necessary to a cause of action under 42 U.S.C. § 1983. However, if plaintiffs' First and Fourteenth Amendment allegations are read as a proposed constitutional cause of action asserted directly under 28 U.S.C. § 1343, they do not create a cause of action "authorized by law" and capable of endowing this Court with jurisdiction. The lower federal courts that have faced this precise issue, whether 28 U.S.C. § 1343(3) jurisdiction is conferred by a constitutional claim alone, have generally agreed that "authorized by law" requires that the constitutional claim be embodied in a statutory cause of action such as 42 U.S.C. § 1983 before there can be jurisdiction under 28 U.S.C. § 1343(3).[20] Therefore, insofar as plaintiffs' allegations under the First and Fourteenth Amendments may be read to be part of a direct constitutional cause of action, this Court lacks jurisdiction under 28 U.S.C. §. 1343(3).[21]

 Plaintiffs' final jurisdictional allegation involves the conjunction of 28 U.S.C. § 1343 and 42 U.S.C. § 1983.[22] To constitute a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that the deprivation of rights of which he complains occurred at the hands of a person acting under color of state law.

In the past, an alleged deprivation of constitutional or federal rights under color of state law was generally considered sufficient to state a cause of action under 42 U.S.C. § 1983. Because it was either assumed that a person must have been responsible for the deprivation or that the "person" requirement under 42 U.S.C. § 1983 was simply a component of the under color of state law element of a 1983 cause of action, courts did not consider defendants in terms of whether or not they were persons. However, these assumptions no longer control for the Supreme Court has addressed itself to the question of the definition of "person" under 42 U.S.C. § 1983 and has narrowed its meaning so as to exclude certain defendants from liability under § 1983 because they are not persons.

This Court must, therefore, determine whether the defendants named in the present case are "persons" for purposes of 42 U.S.C. § 1983. In making this determination, the status of the University of Missouri must be considered apart from that of the individuals named as defendants. This separation is mandated by the two decisions, *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) and *Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), that defined certain entities as non-persons under § 1983.

### The Monroe and Bruno Supreme Court Decisions

In *Monroe v. Pape*, the Supreme Court held that in the context of a suit for monetary damages, a municipal corporation is

---

**20.** See e. g., *Harkless v. Sweeney Indep. School Dist.*, 300 F.Supp. 794 (S.D.Tex.1969), rev'd on other grounds, 427 F.2d 319 (5th Cir. 1970), cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439; *Kochhar v. Auburn University*, 304 F.Supp. 565 (M.D.Ala.1969).

**21.** 28 U.S.C. § 1331 does not require that an alleged deprivation of constitutional rights be embodied in a statutory cause of action. However, plaintiffs have not asserted jurisdiction under § 1331 or alleged any pecuniary amount in controversy.

**22.** 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

not a person within the meaning of § 1983. *Monroe v. Pape* endowed municipal corporations sued under § 1983 with ghost-like qualities: persons so long as they were sued only for equitable relief, they were mysteriously disembodied by suits for monetary damages. The Supreme Court later terminated this disparity in *Kenosha v. Bruno,* wherein it held that municipal corporations were no longer persons under § 1983 when sued for equitable relief.

The rationale behind *Monroe* and *Bruno* is not clearly articulated. *Monroe* is based on an analysis of the legislative history of § 1983.[23] *Bruno* is justified by the need to fill the gap in municipal immunity under § 1983 left by *Monroe.* The question that faces this Court in this case is whether, in the light of *Monroe* and *Bruno,* the University of Missouri, a corporation established under the constitution and statutes of the State of Missouri, is a person under § 1983.

The Supreme Court has not yet had occasion to determine whether the holdings of *Monroe* and *Bruno* should be extended to state institutions of higher education. In both *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Papish v. Board of Curators of University of Missouri,* 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973) plaintiffs sought equitable relief from corporate state educational institutions. The Supreme Court did not address the issue of whether or not the defendant universities were persons under § 1983. However, at the time *Papish* and *Roth* were decided, the Court had not yet held that municipal corporations were non-persons insofar as equitable suits under § 1983 were concerned. Therefore, the Court's assumption in *Papish* and *Roth* that defendant universities were amenable to suit for equitable relief was wholly consistent with the then variable characteristics of municipal corporation defendants under § 1983. After *Bruno,* the amenability of state universities to suit for equitable relief under § 1983 can no longer safely be assumed, although a court might *conclude* that *Bruno* does not prevent suit under § 1983 against a state university or college.

Although the dichotomy between suits under § 1983 for monetary damages and equitable relief is now ended, it was against that background that a number of lower federal courts faced the issue of whether a state university was a person when sued under § 1983. Some courts explicitly took the equitable relief-damages distinction into account in their decisions on this question.[24] A few courts specifically disavowed the significance of such a distinction.[25] Other courts analyzed the issue in terms of whether or not the defendant had acted under color of state law, apparently impliedly assuming that the defendant was a person.[26] Still others concluded that a defendant university was not a person under § 1983 because it was or resembled a state agency.[27]

---

**23.** The Supreme Court did not focus on the meaning of "person" but on Congressional rejection of an amendment that would have imposed broad liability on subdivisions of state government for certain injuries.

**24.** For example, the court in *Kirstein v. Rector and Visitors of the University of Virginia,* 309 F.Supp. 184 (E.D.Va.1970) (3 judge court) found a cause of action under § 1983 only for equitable relief. Insofar as plaintiff sought monetary damages, the court held that defendants, which were corporate bodies and agencies of the state, were not amenable to suit under § 1983. This distinction was also applied in *Holliman v. Martin,* 330 F.Supp. 1 (W.D.Va. 1971). In *Wolfe v. O'Neill,* 336 F.Supp. 1255 (D.Alaska 1972), plaintiff sought only equitable relief from defendants which included the University of Alaska, its president and the members of the Board of Regents. The Court found

that for purposes of equitable relief, all defendants were § 1983 persons. In *Lee v. Board of Regents of State Colleges,* 441 F.2d 1257 (7th Cir. 1971), defendant was held to be a person under § 1983 where the relief sought was declaratory.

**25.** See *Braden v. University of Pittsburgh,* 477 F.2d 1 (3d Cir. 1973); *Anthony v. Cleveland,* 355 F.Supp. 789 (D.Hawaii 1973).

**26.** See *Green v. Dumke,* 480 F.2d 624 (9th Cir. 1973); *Brown v. Strickler,* 422 F.2d 1000 (6th Cir. 1970).

**27.** See *Kirstein,* supra note 16; *Anthony v. Cleveland,* supra note 17; *Whitner v. Davis,* 410 F.2d 24 (9th Cir. 1969); *Sellers v. Regents of the University of California,* 432 F.2d 493 (9th Cir. 1970).

*The Eighth Circuit Court of Appeals Decision Re Jurisdiction*

Whatever the basis of the decisions before *Bruno* on the issue of whether a defendant state university or college was a person for § 1983 purposes, *Bruno* casts a sufficiently different light on the entire subject to mandate a reappraisal. The Eighth Circuit Court of Appeals is one of the only courts [28] to have had an opportunity for such reappraisal. *Prostrollo v. University of South Dakota,* 507 F.2d 775 (8th Cir. 1974), involved a suit against a state university, its president and the Board of Regents, by college students challenging a university parietal rule. The United States District Court for the Southern District of South Dakota held the challenged rule unconstitutional. The Eighth Circuit reversed and remanded, specifically ordering the district court to dismiss the complaint against the University and the Board of Regents for lack of jurisdiction. The Court of Appeals footnoted the reason for this order on remand as follows:

"We also note that jurisdiction is premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1343. Although the defendants have not raised this jurisdictional question, we think it is fundamental that the University of South Dakota and the corporate body constituting the Board of Regents, both political subdivisions of the state, may not be sued under the Civil Rights Act since neither entity constitutes a "person" within the meaning of § 1983. *Kenosha v. Bruno,* 412 U.S. 507, [93 S.Ct. 2222, 37 L.Ed.2d 109] (1973); *Moor v. County of Alameda,* 411 U.S. 693, [93 S.Ct. 1785, 36 L.Ed.2d 596] (1973); *Jorden v. Metropolitan Utilities District,* 498 F.2d 514 (8th Cir. 1974); cf. *Board of Trustees v. Davis,* 396 F.2d 730 (8th Cir.), cert. denied, 393 U.S. 962, [89 S.Ct. 401,

21 L.Ed.2d 375] (1968). The district court erred in assuming it had jurisdiction of plaintiffs' complaint against these defendants under § 1343."

*Prostrollo* makes it clear that the defendants in the instant case must be viewed from the § 1983 person perspective. Although the Missouri university system is not identical to that of South Dakota, the rationale underlying the *Prostrollo* holding that the University of South Dakota was not a person applies with equal force to the present case. Those cases cited in support of *Prostrollo* clearly transcend the unique circumstances of the South Dakota university system.[29] They go, on the contrary, to the more general issue of the extent of liability created by federal civil rights statutes for subdivisions of state government. In line with the trend toward narrowing such liability, the Eighth Circuit held that the University of South Dakota and its corporate governing board were not "persons" and therefore were not liable under § 1983. Nothing in the record before this Court suggests that the precedent supporting that exclusion from liability should not be equally controlling here.

Furthermore, the relationship of the University of Missouri to the State of Missouri is such that following *Prostrollo* is practically as well as legally mandated. The University of Missouri is "incorporated and created a body politic and shall be known by the name of 'The Curators of the University of Missouri.'"[30] The University, a corporate entity, is governed by a Board of Curators who are appointed by the Governor, with the advice and consent of the Missouri Senate. The University is maintained by the Missouri General Assembly "as it may deem necessary." The structure of the Missouri University system, as established by statute and constitution, is clearly

---

**28.** See also *Samuel v. University of Pittsburgh,* 375 F.Supp. 1119 (W.D.Pa.1974).

**29.** *Bruno* and *Jordan* involved defendants which were municipal corporations. *Moor v. County of Alameda* was based upon an interpretation of the scope of the 1871 Civil Rights Act, from which 42 U.S.C. § 1983 is in part

derived. *Davis* concerned the liability of the president and individual members of the Board of Trustees of Arkansas A & M College. *Davis* is not affected by *Bruno,* since the defendants in *Davis* were individual officers and trustees rather than entities with corporate attributes.

**30.** VAMS 172.020.

one wherein the University has extremely close ties to the state. Although it is an autonomous corporate entity, it is governed by state appointees and entirely dependent on the state for its very lifeblood, money. The evidence convinces that the state-University relationship is as intimate in political reality as it appears in the more abstract realm of statutory and constitutional provisions.

The status of the University of Missouri is, in fact, quite similar to that of municipal corporations, which owe their existence to the state and have been defined as non-persons under § 1983 [31] and to that of state agencies, which also enjoy various immunities.[32]

### The University Is Not A Person Under 42 U.S.C. § 1983

This Court concludes, for the foregoing reasons, that the University of Missouri is not a person under § 1983. This Court therefore, lacks jurisdiction under 28 U.S.C. § 1343(3) over the plaintiff's § 1981, § 1983 and § 1988 claims against the University of Missouri, and those claims must, accordingly, be and are dismissed.[33]

Plaintiffs do, however, state a cause of action under § 1983 against the remaining defendants: The president of the University and the individual members of the Board of Curators. Monroe, Bruno and their progeny do not apply to individual defendants. Furthermore, and more fundamentally, the Eleventh Amendment does not immunize individual defendants, albeit

state officials, from suits for equitable relief under 42 U.S.C. § 1983.[34] By naming individual Curators as defendants, plaintiffs have avoided the difficulties of entity status under § 1983.

### As to the Individual Defendants, a 1983 Cause of Action is Stated

All individual defendants are persons for purposes of § 1983 and are amenable to suit thereunder if their actions occurred under color of state law. There is no question in the minds of the parties or of this Court that President Ratchford and the individual Curators acted under color of state law in the matters at issue in the instant case. Plaintiffs have, therefore, stated a cause of action under § 1983 against all defendants and this Court has jurisdiction over that cause of action under 28 U.S.C. § 1343(3).

### The First and Fourteenth Amendments

The United States Supreme Court has read the First Amendment to include a right to freedom of association which is applicable to the states through the due process clause of the Fourteenth Amendment. *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Freedom of association is not limited to the physical or social aspects of association. Its core, insofar as First Amendment protection is concerned, is group expression. Individual voices, when joined together as the voice of a group or organization, may command more attention and respect than would the sum of the separate

---

**31.** *Monroe v. Pape,* supra; *Kenosha v. Bruno,* supra.

**32.** The Ninth Circuit has held that state agencies are not persons under § 1983. *Whitner v. Davis,* 410 F.2d 24 (9 Cir. 1969). See also *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) where Eleventh Amendment immunity was held applicable to state agencies.

**33.** The Court notes that the dismissal of the University of Missouri as a defendant does not change the fundamental nature of this action, as plaintiffs have properly stated a cause of action against those individuals responsible for University policy. For purposes of convenience, however, this Court will not refer to

individual defendants by name in the remainder of this opinion, but when speaking of defendants will refer to them collectively as the University of Missouri. This reference is simply shorthand for the name of the president of the University and the individually named members of the Board of Curators and it is not to be read as implying that the University itself, as a corporate entity, is a party to this suit.

**34.** *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Griffin v. County School Board of Prince Edward County,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), *Board of Trustees of Arkansas A & M College v. Davis,* 396 F.2d 730 (8th Cir. 1968).

utterances of individual members. An individual who desires to express himself by means of association with others has standing to assert his or her First Amendment right to do so. Furthermore, the group or association itself may assert the right to freedom of association on its own behalf. *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Therefore, all plaintiffs in this case have standing in the constitutional as well as in the procedural sense discussed earlier, to assert their right to freedom of association.

■ The right to freedom of association is essentially coextensive with the other rights protected by the First Amendment. While it exists at state colleges and universities, which "are not enclaves immune from the sweep of the First Amendment," *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972), it is clearly not absolute. Like other First Amendment rights, freedom of association must be applied "in light of the special circumstances of the . . . environment" of a particular situation. *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Where the environment is that of a state operated educational institution, the Supreme Court has recognized

> "[T]he need for affirming the comprehensive authority of the states and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker* at 507, 89 S.Ct. at 737.

■ A university has the inherent right to adopt and enforce rules and regulations, *Esteban v. Central Missouri State College,*

415 F.2d 1077 (8th Cir. 1969), cert. denied, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970), including regulations governing the procedure for recognition of student organizations.[35] *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). The University of Missouri exercised this regulatory right as to recognition of student groups. Plaintiffs, who availed themselves fully of the University procedure for recognition, have not challenged either the procedural or substantive adequacy of those procedures. Rather, plaintiffs complain that nonrecognition curtailed their constitutional right of freedom of association, denying to them the undisputed benefits that are attached to University recognition. This Court finds that nonrecognition prevented Gay Lib from being eligible to use University facilities for meetings and to receive support out of student activities money.

The Supreme Court made it clear in *Healy v. James* that a denial of such seemingly small benefits may, where a First Amendment right is at stake, rise to the level of a constitutional deprivation. Aside from the nature of the group seeking recognition (an S.D.S. type organization attributed by the college with a predilection for violent behavior solely on the basis of the national reputation of S.D.S.) *Healy v. James* bears some factual similarity to the instant case. The veto of recognition occurred at approximately the same point in the school hierarchy in *Healy v. James* as in the instant case. More significantly, the benefits denied the group by nonrecognition were essentially the same as those involved here.[36] The Supreme Court characterized the denials in *Healy v. James* as impediments to the freedom of association that could not "be

---

**35.** In *Healy,* at page 192, 92 S.Ct. at page 2352, Mr. Justice Powell speaking for a majority of the Court wrote, "Mr. Justice Blackmun, at the time he was a circuit judge on the Eighth Circuit, stated: "We . . . hold that a college has the inherent power to promulgate rules and regulations; that it has the inherent power to discipline; that it has the power appropriately to protect itself and its property; that it may expect that its students adhere to generally accepted standards of conduct." *Esteban v. Central Missouri State College,* 415 F.2d 1077,

1089 (C.A. 8 1969), cert. denied 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1976)."

**36.** In *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266, the "primary impediment to freedom of association flowing from nonrecognition is the denial of use of campus facilities for meetings and other appropriate purposes." Plaintiffs were also denied the use of campus bulletin boards and the school newspaper. The record was unclear as to whether recognition created eligibility to seek funds from the school budget.

viewed as insubstantial". On the basis of *Healy v. James,* as logically extended to apply to the facts of the instant case, this Court finds that the denial in the instant case of the use of campus facilities and of student activities funds created substantial impediments.

In balancing the right to freedom of association against the state interest supporting its curtailment, the Supreme Court in *Healy v. James* enunciated the burden of proof that is to apply in cases where recognition of a student group is at issue on First Amendment terms. The Court also cited specific types of state interest that would, if proved, be sufficient to justify the abridgement of freedom of association.

▇▇▇▇ The burden is upon the University to justify its decision of rejection. This burden is a "heavy" one, because despite the University's legitimate interest in maintaining order and decorum on campus, a denial of recognition serves as a type of prior restraint of a First Amendment right. See, *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The University of Missouri, therefore, bears the burden of justifying its decision not to recognize Gay Lib.

### The Determinative Question and the Pertinent Evidence

The critical and decisive question of whether or not the University of Missouri has met its heavy burden of justifying its

decision not to recognize Gay Lib is a close one on the evidence adduced at the trial.

By way of partial summary of the critical testimony Dr. Harold Moser Voth,[37] a highly qualified medical expert in the homosexual field testified on behalf of the defendants at the evidentiary hearing before the Honorable Cullen Coil as follows:

"Q. I will ask you, doctor, if you have an opinion based upon a reasonable degree of medical certainty whether the recognition of the group described and connected with the (Gay Lib) statement of purpose would tend to cause the state laws of Missouri on sodomy to be broken?

"A. In the sense that I said a moment ago that the forming of an organization would tend to reinforce the personal identity and behavior of the individual, bringing like people together; in the sense that it would reflect society's implicit, if not explicit condonement of this organization. Yes, I think it would tend to further homosexual behavior. I think it would go on anyway, certainly, but giving it formal status I think would tend to perpetuate it or expand it.

"Q. Are we talking about a near possibility or probability or what?

"A. Well, it is an inference. I think when you institutionalize a cluster of behavior, you are giving it a thrust. You are bound to perpetuate it, as I see it. I can't imagine otherwise.

"Q. But you would get activities which would be in breach of the sodomy laws of the State of Missouri?

"A. Well, if they do those things, then they are going to be breaking the law, right."

In its deposition of Dr. Charles Socarides, likewise a highly qualified expert in the field,[38] the University posed a hypothetical

---

**37.** Dr. Voth received his medical degree from the University of Kansas in 1948. He is a certified psychoanalyst, having graduated from the Topeka Psychoanalytical Institute and is a Charter Fellow of the American College of Psychoanalysts, a member of the faculty of the Menninger School of Psychiatry since 1953, a nationally recognized consultant and the author of numerous medical articles in his field. He is also a member of the American Medical Association, the American Psychiatric Association, the Association for the Advancement of Science, the New York Academy of Sciences,

the International Psychoanalytic Association, among others. His wide experience includes serving as a practicing psychiatrist in the Armed Services.

**38.** Dr. Socarides received his medical degree from New York Medical College in 1947. He interned at St. Elizabeth's Hospital in Washington, D.C. in 1947–48. He received his psychiatric residency training at Bronx V.A. Hospital, Bronx, New York; his psychoanalytic training at Columbia University, receiving his certificate of training in 1952. He belongs to the customary medical associations. He has writ-

question based upon the factual situation at the University of Missouri, asking whether given that situation, recognition of Gay Lib would, in his opinion, based upon a reasonable degree of medical certainty, cause the sodomy laws of the State of Missouri to be broken. Dr. Socarides answered as follows:

"I believe that *wherever you have a convocation of homosexuals, that you are going to have increased homosexual activities, which, of course, includes sodomy. It is one of the most prevalent forms of sexual expression in homosexuality.* And I know that for a fact from hearing from my patients, who go to gatherings of homosexuals and where there is a great deal of cruising and a great deal of picking up of partners. So that any gathering would certainly promote such sexual contact."

The testimony of a highly qualified expert, such as are Doctors Voth and Socarides, by way of his professional, expert

medical opinion is substantial evidence which a Court as the trier of the facts may accept and ascribe appropriate probative value, including the finding that such testimony together with the other credible evidence that supports it meets the heavy burden of proof which the defendants must meet in this case.[39]

██ The undersigned Court as the trier of facts accepts the above quoted testimony of Doctors Voth and Socarides as being logical, convincing and persuasive on the critical issue of fact as to whether the recognition of Gay Lib by the University would likely result in the commission of felonious acts of sodomy proscribed by the Missouri Criminal Statute on the subject. That statute provides:

"§ 563.230 *The abominable and detestable crime against nature—penalty*

Every person who shall be convicted of the detestable and abominable crime

---

ten and published widely, including a book, "The Overt Homosexual" widely used as the textbook in the field. In 1975 he chaired a panel of the American Medical Association on transsexual surgery and its implication for psychiatry and the practitioner of medicine at large. He is in the private practice of psychiatry and psychoanalysis and also associate clinical professor at Albert Einstein College of Medicine, where he teaches and supervises psychiatric residents in the practice, diagnosis and therapy of emotional disorders. He also gives a course to advance students on sexual development and the sexual deviations, including the diagnosis and treatment of the sexual deviations, sexual perversions and homosexuality. He is on the faculty and lectures in his field of speciality at Columbia University.

**39.** Plaintiffs called as its qualified expert in this field Dr. Robert C. Kolodny. Dr. Kolodny is a qualified medical doctor with some training in psychiatry. He is not a psychiatrist. He stated, "the phenomena of homosexuality is the practice between two members of the same biologic sex of sexual activity." * * * "that every individual carries the potential towards homosexuality given certain sets of circumstances or conditions or changes in their lives that might motivate them or interest them in orienting themselves in that direction." He also testified that it is his belief that homosexual behavior is normal behavior. He stated, "Would I be unhappy if a child of mine was functioning as a homosexual? No, sir, I would not . . . ." Dr. Kolodny further testified that in his opinion the recognition of Gay Lib

would neither increase homosexuality nor homosexual practices on the campus. Dr. Kolodny was asked:

"Q. Do you have an opinion as to what effect the existence of such a group on a university campus would have on the sexual behavior of the student population of the campus?

"A. Yes, I do. I do not believe that there would be any discernible effect upon the sexual behavior of the student population.

"Q. Why do you make that statement?

"A. I make that statement for two reasons primarily. One is my clinical knowledge of human sexual behavior. The second is from *actual knowledge of what, in fact has occurred* on several campuses where homosexual groups have been allowed to acquire office space, hold social functions, and sponsor university activities. In this situation, in the campuses that I am familiar with where data has been gathered, there has not been a change in the degree of homosexuality—I might alter that—there has not been a change in the percentage of students on that campus who are swinging toward homosexual behavior and leaving heterosexual behavior."

The undersigned Court in the exercise of its functions as the trier of the facts, does not give this testimony a persuasive effect in its consideration of all the testimony in this case. It is well known that the sex drive is a basic drive of mankind and homosexuality according to Dr. Voth and Dr. Socarides can be expected to increase and to include sodomy "whenever you have a convocation of homosexuals."

against nature, committed with mankind or with beast, with the sexual organs or with the mouth, shall be punished by imprisonment in the penitentiary not less than two years." [40]

The Websters New International Dictionary (unabridged) defines *sodomy* as:

"carnal copulation with a member of the same sex or with an animal or unnatural carnal copulation with a member of the opposite sex; *specif.* the penetration of the male organ into the mouth or anus of another."

In *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266, after first noting that ". . . it cannot be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish", the Supreme Court declared: "If this reason, (campus activities that were likely to cause a disruptive influence) directed at the organization's activities rather than its philosophy, were factually supported by the record, this Court's prior decisions would provide a basis for considering the propriety of nonrecognition. The critical line heretofore drawn for determining the permissibility of regulation is the line between mere advocacy and advocacy 'directed to inciting or producing imminent lawless action and is likely to produce such action.' " (Citing,

*Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430, 434 (1969).

█ Certainly it is the law that the University, acting here as an instrumentality of the State, has no right to restrict speech or association "simply because it finds the views expressed to be abhorrent." *Healy v. James,* 408 U.S. at 187, 188, 92 S.Ct. at 2350. However, the First Amendment does not require that the University sanction and permit the free association of individuals as a student campus organization where, as the Court now finds from the evidence, that association is likely to incite, promote, and result in acts contrary to and in violation of the sodomy statute of the State of Missouri.[41] The members of Gay Lib, or for that matter any of those on the school campus who desire to do so, are free to express within the law their beliefs and views of homosexuality and of the Missouri Criminal Statutes on that subject. But it is a far different thing to show a right under the First Amendment to receive official school recognition of Gay Lib with all of the associational conditions that are likely to result therefrom. The legitimate interest of the University as a state institution includes the right to refuse the requested recognition and its concomitants where the result predictably is to bring on the commission of crimes against the sodomy statutes of the State of Missouri.[42]

**40.** There is no attack in this case on the constitutionality of the Missouri Sodomy Statute. In the recent case of *State v. Crawford,* 478 S.W.2d 314 (Mo.1972), appeal dismissed, 409 U.S. 811, 93 S.Ct. 176, 34 L.Ed.2d 66, reh. denied, 409 U.S. 1051, 93 S.Ct. 536, 34 L.Ed.2d 505, it was held that the language of this section, in context, and as spelled out by judicial construction and commonly understood meaning of euphemism "the detestable and abominable crime against nature," conveys to persons of common intelligence and understanding, and to the public at large, adequate description of prohibited acts and fixes ascertainable standard of guilt and thus was not unconstitutionally vague and did not deprive defendant of his right to demand nature and cause of accusation against him or deprive him of liberty without due process of law or equal protection of the law as guaranteed by State and Federal Constitution.

**41.** In *Healy v. James,* supra, at 193, 92 S.Ct. 2338, at 2352, the Court suggests that recognition should be granted if the group could be taken "to have an announced willingness to be bound by reasonable school rules governing conduct." Such language is not appropriate to the facts of the present case where the evidence, which the Court has accepted as credible and persuasive, is that the requested recognition and activities thereunder are of such a basic nature as to likely incite and produce acts of sodomy in violation of state statute.

**42.** As recently as March 29, 1976, the Supreme Court has upheld the validity of a sodomy statute of the State of Virginia similar to Missouri's. See, *Doe v. Commonwealth's Attorney,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976).

## The Equal Protection Question

Plaintiffs also argue that University non-recognition of Gay Lib constituted a denial of equal protection under the Fourteenth Amendment in two separate ways. First, plaintiffs contend that because the University had permitted another student organization to sponsor homosexual speakers [43] and had permitted professors to teach that homosexuality was not an illness,[44] nonrecognition of Gay Lib constituted a denial of equal protection. Second, plaintiffs contend that because the University had formally recognized other political and social groups on campus, denial of recognition to Gay Lib was a denial of equal protection.[45]

The factual and legal basis offered by plaintiffs in support of their equal protection contentions are meager when compared to those underlying their First Amendment arguments. It is undisputed that the University of a state is subject to the provisions and constitutional restraint of the equal protection clause of the Fourteenth Amendment. The Constitution and its amendments apply to college campuses. *Tinker v. Des Moines School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731. Minority groups, as well as majority groups, must be given an opportunity to express themselves within the law; for only in this way can our system of peaceful social change be maintained. The Fourteenth Amendment requires that the right or privilege of recognition be accorded on an equal basis and without unjustified discrimination to all who seek campus organizational recognition. However, when recognition of an organization seeking University recognition with all the attendant privileges that flow from such recognition directly presents a situation likely to incite and to produce violation of the state's criminal law proscribing acts of sodomy, that organization may not successfully complain that it has been treated differently from organizations that factually do not present such a clear and present danger of violation of the criminal laws of the state. The equal protection clause was not intended to safeguard a group presenting a clear and present danger of violation of the criminal laws of a state by comparing such a group with other groups who do not present that danger. What otherwise might be an impermissible distinction becomes a permissible distinction.

Also, in all equal protection cases a crucial question is whether there is an appropriate governmental interest furthered by the different treatment. Here, the interest of the state university is not to lend itself to recognizing a campus organization with all the attendant privileges thereof where such recognition is likely to incite and produce the violation of the state's sodomy statutes. This presents an acceptable basis for non-recognition of the organization by the University.

## Conclusion

In accordance with the Court's finding and reasons above given, the Court finds the controlling issues against plaintiffs and

---

**43.** The record shows that the University had, in 1973, permitted the Association of Women Students to sponsor a human sexuality program at which homosexuality was discussed by homosexuals.

**44.** Dr. Fred McKinney, Professor of Psychology at the University of Missouri, testified at the hearing before Cullen Coil that he had given lectures teaching the "facts and findings" that homosexuality is not an illness. Dr. Sidney Stahl, Assistant Professor of Sociology and Community Health and Medical Practice, testified at the same hearing that he had tried to teach first and second year medical students that homosexuality is "not a sickness, but essentially a variant form of sexual behavior."

**45.** Testimony by Chancellor Schooling at the evidentiary hearing established that the University had, at one time or another granted recognition to Young Democrats, Young Republicans, the SDS and a Socialist Study Group.

The Court notes that on this point the University cites certain events referred to in the record of the attempt by the Gay Peoples Union at the *University of Missouri at Kansas City* to gain recognition. Because Gay Lib and the other plaintiffs in the instant case have no connection or affiliation with the Gay Peoples Union at the University of Missouri at Kansas City and plaintiffs did not take part in the Kansas City proceedings, the record of those proceedings is irrelevant to the instant cause.

in favor of defendants.[46] The plaintiffs are not entitled to and are hereby denied all of their requested relief, including their requested relief that plaintiffs grant them their requested campus organization recognition.

IT IS SO ORDERED.

---

**46.** Of the several motions taken along with this case, only one remains to be disposed of: plaintiffs' motion for expenses in attendance at a deposition taken by defendants in New York. Under Rule 30 of the Federal Rules of Civil Procedure, the granting of such expenses is left to the sound discretion of the trial court. The Court notes that the cross-examination of Dr. Socarides at his deposition in New York by plaintiffs does not fall within the mandatory purview of F.R.C.P. 26(b)(4)(C). Accordingly, in the exercise of its discretion, this Court hereby denies plaintiffs' motion for expenses of attendance at the deposition of Dr. Socarides in New York.