558 F.2d 848
 50 A.L.R.Fed. 496
 GAY LIB, Lawrence A. Eggleston, Individually and as an
employee of the University of Missouri and as a member of
the Executive Board of Gay Lib, Darrell Napton, Individually
and as a graduate student of the University of Missouri and
as a member of the Executive Board of Gay Lib, Sarah
MacNamara, Individually and as an undergraduate student of
the University of Missouri and as a member of the Executive
Board of Gay Lib, and Doug Hudson, Individually and as an
undergraduate student of the University of Missouri and as a
member of the Executive Board of Gay Lib, Appellants,
v.
The UNIVERSITY OF MISSOURI, C. Brice Ratchford, Individually
and as President of the University of Missouri, Irwin Fane,
Pleasant R. Smith, Mrs. William C. Tucker, Howard Woods,
William C. Myers, Jr., William F. Thompson, John S.
Williamson and Van O. Williams, Individually and as members
of the Board of Curators of the University of Missouri, Appellees.
 No. 76-1656.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 17, 1977.
Decided June 8, 1977.
As Amended on Denial of Rehearing En Banc Aug. 8, 1977.
 
 Lawrence Kaplan, St. Louis, Mo., for appellants.
 James S. Newberry, Columbia, Mo., for appellees; Jackson A. Wright, Marvin E. Wright and Ted D. Ayres, St. Louis, Mo., on brief.
 Before LAY and WEBSTER, Circuit Judges, and REGAN,* District Judge.
 LAY, Circuit Judge.
 
 
 1
 The issue before us is whether officials of a state university may lawfully withhold formal recognition of a student organization, comprised largely of homosexuals, whose basic purpose is to provide a forum for discussion about homosexuality. Gay Lib, an organization at the University of Missouri, and four of its members appeal from the denial of their request for injunctive relief by the United States District Court for the Western District of Missouri, the Honorable Elmo T. Hunter, presiding.[1] In denying the 42 U.S.C. § 1983 claim the district court sustained the University administration's refusal to recognize Gay Lib as a campus organization.[2] The court conceded that the question was a close one, but ruled that the school officials justified their action on the ground that recognition of Gay Lib would probably result in the commission of felonious acts of sodomy in violation of Missouri law.[3] The district court also rejected plaintiffs' claim that nonrecognition denied them equal protection of the laws.
 
 
 2
 On appeal, plaintiffs contend: (1) that the district court erred in holding that plaintiffs' First Amendment rights were not impermissibly infringed; and (2) that the action of the defendants deprived plaintiffs of equal protection of the law. We reverse.
 
 
 3
 Factual Background.
 
 
 4
 Formal recognition of a student organization by the University of Missouri entitles the group to use campus facilities for meetings and to apply for financial support from student activities funds. Written University policies with respect to recognition of campus groups provide that:
 
 
 5
 Groups are recognized on the basis of their own statements as to name, aims, nature and program. $ $ $
 
 
 6
 Recognition of an organization by the Committee does not constitute approval or endorsement of the organization's aims and activities * *.
 
 
 7
 Gay Lib began its efforts to gain formal recognition in early 1971. In accordance with established University procedures, the group submitted a petition for recognition to the Missouri Students Association (MSA). A statement of purposes accompanying the petition set forth the proposed organization's aims as follows:
 
 
 8
 (a) To provide a dialogue between the homosexual and heterosexual members of the university community.
 
 
 9
 (b) To dispel the lack of information and develop an understanding of the homosexual at the University of Missouri.
 
 
 10
 (c) To alleviate the unnecessary burden of shame felt by the local homosexual population.
 
 
 11
 (d) To help education, the community and the homosexual to understand the social roles that the homosexual now plays in the community.
 
 
 12
 (e) To work closely with established university and community groups for a broader sharing of knowledge and information.
 
 
 13
 Both the MSA Rules Committee and the Senate approved Gay Lib's petition. The matter was then referred to the Committee on Student Organizations, Government and Activities (SOGA), which was comprised of students and faculty. While the matter was pending before SOGA, Gay Lib submitted a revised, more detailed statement of purposes.[4]
 
 
 14
 In December, 1971, SOGA voted to recommend recognition of Gay Lib. The recommendation, however, was vetoed by Edwin Hutchins, then Dean of Student Affairs. Hutchins based his veto on "a concern for the impact of recognition on the general relationship of the University to the public at large."[5]
 
 
 15
 Gay Lib appealed the nonrecognition decision to successive levels of the University hierarchy, ending with the President of the University. Each level sustained Hutchins' ruling.[6] Thereafter, Gay Lib appealed the decision to the University's Board of Curators. The Board consolidated the appeal with a related matter arising out of the University of Missouri at Kansas City, and appointed a hearing officer, Cullen Coil, a Jefferson City attorney and former Commissioner of the Missouri Supreme Court, to develop the facts. At the hearings substantial lay and expert testimony was adduced. Following the hearings, Coil recommended that the University deny formal recognition to the organization.[7] Subsequently, the Board denied Gay Lib's appeal, adopting the following resolution:
 
 
 16
 Be it hereby resolved that the Board of Curators of the University of Missouri concurs with and hereby adopts the Hearing Officer's Recommended Findings of Fact made by the Honorable Cullen Coil and further makes the following specific findings of fact:
 
 
 17
 1. The Gay Lib movement as exemplified by the Gay Lib Organization at UMC and the Gay People's Union at UMKC is premised upon homosexuality being normal behavior, contrary to the further findings herein.
 
 
 18
 2. A homosexual is one who seeks to satisfy his or her sexual desires by practicing some or all of the following: fellatio, cunnilingus, masturbation, anal eroticism and perhaps in other ways.
 
 
 19
 3. Homosexuality is a compulsive type of behavior.
 
 
 20
 4. There are potential or latent homosexuals, i. e. persons who come into adolescence or young adulthood unaware that they have homosexual tendencies, but who have fears of sexual relations with a member of the opposite sex.
 
 
 21
 5. What happens to a latent or potential homosexual from the standpoint of his environment can cause him to become or not to become a homosexual.
 
 
 22
 6. That homosexuality is an illness and should and can be treated as such and is clearly abnormal behavior.
 
 
 23
 7. Certain homosexual practices violate provisions of Section 563.230 of the Revised Statutes of Missouri.
 
 
 24
 8. That formal recognition by the University of either or both the proposed Gay Lib and Gay People's Union will:
 
 
 25
 (The Board of Curators here adopted verbatim Mr. Coil's above-cited conclusions as to the effect of formal recognition.)
 
 
 26
 Plaintiffs filed this civil rights action to compel the University to formally recognize Gay Lib, alleging that nonrecognition infringed their First Amendment freedom of association and denied them equal protection. By stipulation of the parties, the transcript of the hearings held at the direction of the Board of Curators, as well as the exhibits introduced at those proceedings, were admitted into evidence. The district court also received depositions of three medical doctors taken by the parties. No other evidence was presented.
 
 
 27
 First Amendment.
 
 
 28
 Although the district court denied plaintiffs relief, Judge Hunter, recognizing Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), stated:
 
 
 29
 (T)he University, acting here as an instrumentality of the State, has no right to restrict speech or association "simply because it finds the views expressed to be abhorrent."
 
 
 30
 416 F.Supp. at 1370, quoting Healy, supra 408 U.S. at 187, 92 S.Ct. 2338.[8]
 
 
 31
 Since the Supreme Court's decision in Healy, the First and Fourth Circuits have sustained the rights of groups similar to Gay Lib to sponsor social functions involving the use of university facilities, Gay Students Org. of Univ. of New Hampshire v. Bonner, 509 F.2d 652 (1st Cir. 1974); and to register as a student organization. Gay Alliance of Students v. Matthews, 544 F.2d 162 (4th Cir. 1976). The analytical discussion offered by these two courts strongly supports recognition of Gay Lib here.[9]
 
 
 32
 Notwithstanding these decisions, defendants assert that the record in this case contains expert medical testimony which provides a legal justification for withholding formal recognition from Gay Lib. They argue, and the district court found, that recognition of Gay Lib would likely result in imminent violations of Missouri sodomy laws.[10]
 
 
 33
 The district court placed reliance on the testimony of two psychiatrists, Dr. Harold Voth and Dr. Charles Socarides. Dr. Voth testified that formal recognition would tend to "perpetuate" or "expand" homosexual behavior. However, on cross-examination, Dr. Voth further testified that his conclusion was "an inference," and "(t)here is no way in the world for me or anyone else to know." Dr. Socarides stated that he believed "that wherever you have a convocation of homosexuals, that you are going to have increased homosexual activities which, of course includes sodomy." He concluded that "any gathering would certainly promote such sexual contact."
 
 
 34
 Also relevant to the district court's determination was the medical opinion proffered by defendants' experts that homosexual behavior is compulsive. However, as demonstrated by the substantial body of professional medical opinion conflicting with defendants' case, it must be acknowledged that there is no scientific certitude to the opinions offered.[11]
 
 
 35
 The district court noted testimony from Dr. Robert Kolodny, a medical doctor with some training in psychiatry. Dr. Kolodny testified that he believed recognition would not have "any discernible effect upon the sexual behavior of the student population." He based his conclusion on his clinical knowledge of human sexual behavior and "from actual knowledge of what, in fact has occurred on several campuses where homosexual groups have been allowed to acquire office space, hold social functions, and sponsor university activities."
 
 
 36
 Defendants urge that their experts are more worthy of belief because of their outstanding professional credentials. We need not pause here since defendants' evidence turns solely on Dr. Voth's conclusory "inference" and Dr. Socarides' "belief," for which no historical or empirical basis is disclosed.
 
 
 37
 Even accepting the opinions of defendants' experts at face value, we find it insufficient to justify a governmental prior restraint on the right of a group of students to associate for the purposes avowed in their statement and revised statement of purposes.[12] While it is difficult to articulate generalized standards as to the quantum and quality of proof necessary to justify the abridgment of First Amendment rights,[13] the many Supreme Court cases dealing with prior restraints[14] and other First Amendment issues[15] make clear that the restriction of First Amendment rights in the present context may be justified only by a far greater showing of a likelihood of imminent lawless action than that presented here.
 
 
 38
 Mr. Justice Harlan, in delivering the opinion of the Supreme Court in NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), emphasized the importance of freedom to engage in association:
 
 
 39
 Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. (Citations omitted.) It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. (Citations omitted.) Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.
 
 
 40
 357 U.S. at 460-61, 78 S.Ct. at 1171.
 
 
 41
 In the present case, none of the purposes or aims of Gay Lib, at least in this record, evidences advocacy of present violations of state law[16] or of university rules or regulations, and the district court made no finding of such advocacy. The district court further made no finding that Gay Lib would "infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." Healy v. James, supra, 408 U.S. at 189, 92 S.Ct. at 2350. So far as the avowed purposes and aims of this association are concerned, in the words of the Fourth Circuit:
 
 
 42
 (I)t is, at most, a "pro-homosexual" political organization advocating a liberalization of legal restrictions against the practice of homosexuality and one seeking, by the educational and informational process, to generate understanding and acceptance of individuals whose sexual orientation is wholly or partly homosexual.
 
 
 43
 Gay Alliance of Students v. Matthews, supra, at 164.
 
 
 44
 It is difficult to singularly ascribe evil connotations to the group simply because they are homosexuals. See Gay Alliance of Students v. Matthews, supra; Gay Students Org. of Univ. of New Hampshire v. Bonner, supra. An interesting fact is that not all members of the group are homosexuals.[17] Furthermore, this approach blurs the constitutional line between mere advocacy and advocacy directed to inciting or producing imminent lawless action. Finally, such an approach smacks of penalizing persons for their status rather than their conduct, which is constitutionally impermissible. See Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).
 
 
 45
 We, of course, acknowledge the statement in Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), repeated in Healy v. James, supra, 408 U.S. at 180, 92 S.Ct. 2338, that the factual circumstances must be evaluated in light of the "special characteristics" of the school environment. In this sense, it is clear that a university has residual power "to assure that the traditional academic atmosphere is safeguarded," and to promulgate reasonable rules and regulations. Healy, supra, 408 U.S. at 194 n.24, 92 S.Ct. at 2352. It may be, as Mr. Justice Rehnquist observed in his concurring opinion in Healy, that the "school administrator may impose upon . . . students reasonable regulations that would be impermissible if imposed by the government upon all citizens." 408 U.S. at 203, 92 S.Ct. at 2357. We note, however, that the interest asserted by defendants in justification for the abridgement of plaintiffs' First Amendment rights is not peculiar to the academic environment. Moreover, it is also axiomatic that the First Amendment must flourish as much in the academic setting as anywhere else. See Papish v. University of Missouri Curators, 410 U.S. 667, 671, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973); Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). To invoke censorship in an academic environment is hardly the recognition of a healthy democratic society.
 
 
 46
 Attorneys' Fees.
 
 
 47
 Plaintiffs also seek an award of attorneys' fees, to be assessed against the defendants as costs, pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, Pub.L.No.94-559 (Oct. 19, 1976), 90 Stat. 2641, 42 U.S.C.A. § 1988 (Dec. 1976 Supp.), which provides in pertinent part:
 
 
 48
 In any action or proceeding to enforce a provision of sections 1981 to 1983, 1985, and 1986 of this title * * * the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 49
 The Act did not become effective until October 19, 1976, subsequent to the conclusion of the district court proceedings; however, we have held that the Act may be applied retroactively in cases in which an appeal was pending on the effective date of the Act. Finney v. Hutto, 548 F.2d 740, 742 (8th Cir. 1977). We feel that this is an appropriate case for an award of attorneys' fees. Accordingly, we award plaintiffs' attorneys fees for the appellate portion of this litigation in the sum of $1,000. We remand the cause to the district court for the determination and entry of an award of reasonable attorneys' fees for the district court phase of this case. See Doe v. Poelker, 515 F.2d 541, 548 (8th Cir. 1975), cert. granted, 428 U.S. 909, 96 S.Ct. 3220, 49 L.Ed.2d 1216 (1976).
 
 
 50
 Conclusion.
 
 
 51
 We hold that the defendants' refusal to recognize Gay Lib as a campus organization denied plaintiffs their First Amendment rights.[18] The judgment of the district court is reversed and the cause remanded for the entry of appropriate injunctive relief and an award of attorneys' fees.
 
 
 52
 WEBSTER, Circuit Judge, concurring.
 
 
 53
 I join in the court's opinion. Of particular significance to me is the prior restraint of First Amendment rights on such skimpy and speculative evidence as appellees advanced below. There is absolutely no evidence that appellants intend to violate any state law or regulation of the university or even that they will advocate such violations. Until such time as imminent overt lawless activity can be shown, the organization may not be excluded from recognition if it is otherwise in compliance with university regulations. Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972).
 
 
 54
 I have no doubt that the ancient halls of higher learning at Columbia will survive even the most offensive verbal assaults upon traditional moral values; solutions to tough problems are not found in repression of ideas. I am equally certain that the university possesses the power and the right to deal with individuals and organizations, "recognized" or not, that violate either its lawful regulations or the laws of the state. There will be time for that if appellees' dire predictions should somehow prove to be correct. The nature of our government demands that we abide that time.
 
 
 55
 REGAN, District Judge, dissenting.
 
 
 56
 I respectfully dissent.
 
 
 57
 I recognize, as did the District Court, that the denial of official recognition to a college organization is a form of prior restraint of the First Amendment of right of association, as held in Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech," NAACP v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488. And as the Supreme Court stated in the last cited case, "Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state actions which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."
 
 
 58
 Having said this, I am nevertheless convinced, after a careful study of the record, that the District Court correctly held that the evidence amply justified the considered decision of the University officials to deny recognition to Gay Lib.
 
 
 59
 What Healy v. James held was that "denial of official recognition, without justification, to college organizations burdens or abridges the right of individuals to associate to further their personal beliefs." Healy involved a "left wing" group (Students for a Democratic Society) which sought recognition at a time when "(t)here had been widespread civil disobedience on some (college) campuses, accompanied by the seizure of buildings, vandalism and arson," with respect to which "SDS chapters on some of these campuses had been a catalytic force during this period." However, inasmuch as there was a total absence of any evidence that the organization seeking recognition itself actually "posed a substantial threat" that it would constitute a disruptive force on campus, there was, on the record, "no justification" for denying recognition to that group.
 
 
 60
 I do not read Healy as mandating that in every case involving non-recognition of a campus group a showing of the certitude of imminent overt lawless or disruptive activity must be made. Rather, the issue is whether, under the circumstances, justification of the appropriateness of denial of recognition has sufficiently been shown.
 
 
 61
 The credible testimony of highly qualified psychiatrists persuasively demonstrates to me, as it did to the District Court, that homosexual behavior is compulsive and that homosexuality is an illness and clearly abnormal. In view of the expert testimony which in my view is neither "skimpy (nor) speculative," defendants were warranted in concluding that formal recognition of Gay Lib would tend to expand homosexual behavior and activity on campus and likely result in felonious acts of sodomy proscribed by Missouri law. As the District Court stated: "The legitimate interest of the University as a state institution includes the right to refuse the requested recognition and its concomitants where the result predictably is to bring on the commission of crimes against the sodomy statutes of the State of Missouri."
 
 
 62
 With all due respect to the majority, I do not agree that the combined testimony of the psychiatrists testifying for the defendants stands on no different footing than that of the school principal in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In light of the admittedly "outstanding professional credentials" of the psychiatrists, they were eminently qualified by training and experience to express expert opinions on the subject of homosexuality and the effect of recognition of Gay Lib by the University.
 
 
 63
 As for Tinker, it held only that individuals had the right to wear black armbands as a silent, passive expression of their disapproval of this country's Viet Nam policy. Such a purely symbolic act was "unaccompanied by any disorder or disturbance" on their part or any "interference, actual or nascent, with the schools' work or . . . collision with the rights of other students to be secure and to be let alone." The case was not ruled in the context of group action. It involved only the school authorities' disagreement with the philosophy being expressed by the wearers of the black armbands. It is totally unlike the situation here present. Here, the officials' denial of recognition to Gay Lib was not based on "mere disagreement" with the group's "philosophy."
 
 
 64
 Moreover, state university officials have a responsibility not only to taxpayers but to all students on campus, and that responsibility encompasses a right to protect latent or potential homosexuals from becoming overt homosexual students. In carrying out these responsibilities, they were aware that unlike recognition of political associations, whether of the right, center or left, an organization dedicated to the furtherance and advancement of homosexuality would, in any realistic sense, certainly so to impressionistic students, imply approval not only of the organization per se but of homosexuality and the normality of such conduct, and thus adversely affect potential homosexual students. In my opinion, the University was entitled to protect itself and the other students on campus, in this small way, against abnormality, illness and compulsive conduct of the kind here described in the evidence.
 
 
 65
 Finally, I do not agree that the "clearly erroneous" rule may be rejected in this case. The mere fact that the testimony was submitted to the district court in deposition and transcript form does not justify a completely de novo approach by this Court. See Frank Adam Electric Co. v. Colt's Patent Fire Arms Mfg. Co., 148 F.2d 497, 499 (8th Cir. 1945), holding, per Judge Sanborn,
 
 
 66
 While the Special Master, who tried this case upon the written transcript taken before Judge Davis (who subsequently died), had no better opportunity to weigh the evidence than we have, this court will not try the case de novo. The findings of fact of the Special Master, which have been approved by the District Court, are conclusive upon this court in so far as they are not clearly erroneous.
 
 
 67
 The case of Frito-Lay, Inc. v. So Good Potato Chip Co., 540 F.2d 927, cited by the majority, does not involve a comparable situation. Judge Webster, after noting that there was no dispute as to the evidence and that no credibility issues were before this Court, pointed out that the crucial finding of the trial court was not based on expert testimony but rather upon that court's interpretation of a non-ambiguous contract and his personal observation of physical exhibits which this Court also viewed. Even so, Judge Webster was careful to make clear that "(t)he factual determinations underlying the issue of 'similarity' remain subject to the clearly erroneous standard of review."
 
 
 68
 The other cases cited by the majority, Oil Screw Noah's Ark v. Bentley & Felton Corp., 322 F.2d 3, and United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746, are equally inapposite. They recognize the force of the clearly erroneous rule which authorizes the reversal of a district court's findings only if the reviewing court has the "firm conviction that a mistake has been committed," or, as the rule is stated in Oil Screw Noah's Ark, the definite feeling that "a fundamentally wrong result has been reached."
 
 
 69
 I am firmly of the view that Rule 52, FRCP, which mandates that the district court's "(f)indings of fact shall not be set aside unless clearly erroneous," precludes reversal in this case. Granted that the trial court had no better opportunity than this panel to judge the credibility of the witnesses, a factor which may not be ignored, nevertheless, the plain language of the Rule makes the clearly erroneous principle here applicable. And since I do not have a firm conviction that the trial court reached a fundamentally wrong result, I would affirm.
 
 On Petition for Rehearing En Banc
 
 70
 The petition for rehearing en banc is denied by an evenly divided court.
 
 
 71
 GIBSON, Chief Judge, joined by HENLEY, Circuit Judge, files the following statement in regard to the denial of the petition for rehearing en banc:GIBSON, Chief Judge.
 
 
 72
 I dissent from the denial of the petition for rehearing en banc. In my opinion, Fed.R.Civ.P. 52 has been misapplied in this case and the District Court's findings of fact, which are supported by the record, have been improperly displaced by appellate findings of fact.
 
 
 73
 The divided panel opinion seems to hold that the "clearly erroneous" standard of Rule 52 does not apply to this case. See ante n. 10. This approach misconceives the reach of Rule 52 and ignores the traditional rule that appellate courts do not review a trial judge's factual findings de novo. Even where the evidence at trial consists solely of depositions and other documentary evidence, the appellate court must respect the trial judge's credibility evaluation and adopt his findings unless they are clearly erroneous. Merrill Trust Company v. Bradford, 507 F.2d 467 (1st Cir. 1974); Aetna Casualty and Surety Co. v. Hunt, 486 F.2d 81 (10th Cir. 1973); Volkswagen of America, Inc. v. Jahre, 472 F.2d 557 (5th Cir. 1973); Frank Adam Electric Co. v. Colt's Patent Fire Arms Mfg. Co., 148 F.2d 497 (8th Cir. 1945).
 
 
 74
 The District Court, accepting the testimony of two highly qualified psychiatrists, found that recognition of Gay Lib would likely result in imminent violations of the Missouri sodomy laws. To rebut this expert psychiatric testimony, Gay Lib relies on the testimony of a medical doctor who is not a psychiatrist; an assistant professor of psychology who stated that he had not undertaken any in-depth research into the etiologies of homosexuality, but "doubt(ed)" that recognition of Gay Lib would increase actual homosexual behavior; and a professor of psychology who admitted in his testimony that "I'm not saying that the existence of such a (homosexual) group wouldn't" increase the incidence of homosexuality on the campus.
 
 
 75
 The District Court, confronted with this conflicting testimony, accepted the testimony of the psychiatric experts rather than the above testimony of non-psychiatrists. Lacking training in the psychiatric discipline, appellate judges are ill-prepared to conclude that these expert psychiatric opinions lack an historical or empirical basis. Maybe an appellate court, reviewing this case de novo, would have made a finding different than the District Court's. But our review is not so unbridled that we can reject the District Court's findings on that basis. "It is not enough that we might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent." United States v. National Association of Real Estate Boards, 339 U.S. 485, 495, 70 S.Ct. 711, 717, 94 L.Ed. 1007 (1950). Our review is circumscribed by the clearly erroneous standard, which allows us to reject a finding of the District Court only if we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). I find adequate evidentiary support for the District Court's findings and would not disturb them.
 
 
 76
 Given the finding that recognition of Gay Lib would likely result in imminent violations of Missouri sodomy laws, there is no prior restraint issue in this case. There is "little doubt that the University could constitutionally regulate such conduct," Gay Alliance of Students v. Matthews, 544 F.2d 162, 166 (4th Cir. 1976), and the First Amendment does not require a University to extend formal recognition to a campus organization that will engage in criminal activity, Healy v. James, 408 U.S. 169, 188-89, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). Citizens possess no First Amendment right to engage in illegal activity and, in light of the District Court's findings, the University officials' action did not constitute an impermissible prior restraint.
 
 
 77
 This case involves the sensitive and polemical issue of homosexual rights, an issue which has spawned nationwide debate and attention. The limited question here is whether a homosexual group has a First Amendment right to be recognized by a university and thus to be entitled to use school facilities and to be eligible for student activities funds. These First Amendment arguments must be considered in light of the special characteristics and interests of an educational institution. Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). These institutions are populated by young, often impressionable students; school officials have a responsibility to shield these students from exposure to probable illegal conduct on the campus. Missouri law has criminalized sodomy and the District Court found that recognition of Gay Lib would result in imminent violations of that law. Under these circumstances, it was permissible for school officials to withhold recognition of Gay Lib. Requiring the school to recognize Gay Lib places school officials in the unseemly position of officially sanctioning this conduct and making school funds and facilities available for the use of a homosexual organization, whose members will likely engage in criminal activity, a situation not mandated by the First Amendment.
 
 
 78
 This is yet another example of unwarranted judicial intrusion into the internal operations of an educational institution. School officials are charged with the responsibility of making and implementing policy decisions. Before deciding not to recognize Gay Lib, the Board of Curators appointed a hearing officer, who heard substantial lay and expert testimony on this issue. His recommendation that the school not recognize Gay Lib was adopted by the Board of Curators. I would defer to the policy decisions of school administrators, who are more attuned to the interests of the students and the school than we are. We are not school administrators and have no authority to dictate school policy unless there is a clear showing of a constitutional violation. I find no such violation here. I am in accord with Judge Regan's dissenting opinion and would affirm the District Court's Judgment.
 
 
 79
 STEPHENSON, Circuit Judge.
 
 
 80
 I concur in Chief Judge Gibson's dissent from the denial of the petition for rehearing en banc with the reservation that it is my view that this court is not bound by the District Court's credibility evaluation of witnesses where the evidence is submitted by deposition or in other documentary form.
 
 
 
 *
 The Honorable John K. Regan, United States District Judge for the Eastern District of Missouri, sitting by designation
 
 
 [1]
 The district court's opinion is reported at 416 F.Supp. 1350 (W.D.Mo. 1976)
 
 
 [2]
 The appeal is brought against the individual members of the Board of Curators and the University President. The district court dismissed the action as to the University on the ground that the University or Board of Curators is not a "person" for purposes of 42 U.S.C. § 1983, relying on Prostrollo v. University of South Dakota, 507 F.2d 775 (8th Cir. 1974), cert. denied, 421 U.S. 952, 95 S.Ct. 1687, 44 L.Ed.2d 106 (1975). See City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). No appeal was taken from this ruling. We note that the Supreme Court has recently declined to decide the issue of whether a school district is a "person" for purposes of § 1983. Mt. Healthy City School Dist. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)
 
 
 [3]
 Mo. Ann. Stat. § 563.230 (Vernon) provides:
 Every person who shall be convicted of the detestable and abominable crime against nature, committed with mankind or with beast, with the sexual organs or with the mouth, shall be punished by imprisonment in the penitentiary not less than two years.
 
 
 [4]
 The revised statement provided:
 
 
 [1]
 Gay Lib intends to create a forum for the study of the sexual statutes of this state and especially of the sodomy law now in effect. Through study of the intent of the law and of its psychological and sociological implications, it will be possible to more fully understand what the full meaning is of being gay. Through knowledge of the law, it becomes possible to create an atmosphere within which the present statute may be revised or eliminated through an educational and candid look at all ramifications of such laws and their rationale. Changes of other such laws outside of Missouri and in nations such as Great Britain will provide a fuller context
 
 
 [2]
 Gay Lib seeks to promote meaningful communication between all members of the University community, whether homosexual or heterosexual. With candor and compassion on both sides, much of the fear of the unknown can be eliminated and scars of past repression may be healed. This communication is specifically intended to be two-way in nature. The gay world has just as much to learn from the straight world as they have to offer it. We seek to develop an atmosphere in which people are themselves first and sexual entities second
 
 
 [3]
 Gay Lib wants to provide information to the vast majority of those who really don't know what homosexuality or bisexual behavior is. Too much of the same prejudice is now directed at gay people just as it is directed at ethnic minorities
 
 
 [4]
 Gay Lib does not seek to proselytize, convert, or recruit. On the other hand, people who have already established a pattern of homosexuality when they enter college must adjust to this fact
 
 
 [5]
 Gay Lib hopes to help the gay community to rid itself of its subconscious burden of guilt. Society imprints this self-image on homosexuals and makes adjustment with the straight world more difficult
 
 
 [6]
 Gay Lib hopes to function as a channel for those who find difficulty in sexual adjustment. While we do not pretend to have psychiatric expertise, we can reach people who do not trust normal channels for such help and enable them to contact professional help as required
 
 
 [7]
 As an educational group, Gay Lib does not advocate any violation of state statutes. We serve as a forum for understanding and knowledge where this is now lacking
 
 
 [5]
 Hutchins' reasons for the veto were set forth in a lengthy letter addressed to Dr. Ray Lansford, the SOGA chairman. The letter is reproduced in full in the district court's opinion, 416 F.Supp. at 1355-57
 
 
 [6]
 The circumstances of the administrative appeals are detailed in the district court's opinion, 416 F.Supp. at 1357-58
 
 
 [7]
 Coil found that formal recognition of Gay Lib would:
 (1) give a formal status to and tend to reinforce the personal identities of the homosexual members of those organizations and will perpetuate and expand an abnormal way of life, unless contrary to their intention as stated in their written purposes, the homosexual members make a concerted effort to seek treatment, recognize homosexuality as abnormal and attempt to cease their homosexual practices;
 (2) tend to cause latent or potential homosexuals who become members to become overt homosexuals;
 (3) tend to expand homosexual behavior which will cause increased violations of section 563.230 of the Revised Statutes of Missouri;
 (4) be undesirable insofar as homosexuals will counsel other homosexuals, i. e., the sick and abnormal counseling others who are similarly ill and abnormal; and
 (5) constitute an implied approval by the University of the abnormal homosexual life-style as a normal way of life and would be so understood by many students and other members of the public, even though, and despite the fact that, the University's regulations for student organizations provide that recognition of an organization by the University does not constitute approval or endorsement of the organization's aims or activities.
 
 
 [8]
 In Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), the Supreme Court held that students at Central Connecticut State College had a right to form a local chapter of Students for a Democratic Society and have the group recognized as a campus organization, absent a showing that the group advocated imminent lawless action and that it was likely to incite or produce such action, that the group materially and substantially disrupted the work and discipline of the school, or that it would fail to abide by reasonable campus rules and regulations. The Court rejected the college president's disagreement with the group's philosophy as an acceptable basis for withholding recognition:
 The mere disagreement of the President with the group's philosophy affords no reason to deny it recognition. As repugnant as these views may have been, especially to one with President James' responsibility, the mere expression of them would not justify the denial of First Amendment rights. Whether petitioners did in fact advocate a philosophy of "destruction" thus becomes immaterial. The College, acting here as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent.
 408 U.S. at 187-88, 92 S.Ct. at 2349.
 The Court remanded the case to the district court for further consideration as to whether the organization pledged to abide by reasonable campus rules and regulations.
 
 
 [9]
 As Judge Winter of the Fourth Circuit observes:
 If the University is attempting to prevent homosexuals from meeting one another to discuss their common problems and possible solutions to those problems, then its purpose is clearly inimical to basic first amendment values. Individuals of whatever sexual persuasion have the fundamental right to meet, discuss current problems, and to advocate changes in the status quo, so long as there is no "incitement to imminent lawless action." (Citation omitted.)
 If, on the other hand, VCU's concern is with a possible rise in the incidence of actual homosexual conduct between students, then a different problem is presented. We have little doubt that the University could constitutionally regulate such conduct. (Citations omitted.) Additionally, it may regulate any conduct (homosexual or otherwise) which "materially and substantially disrupt(s) the work and discipline of the school." (Citation omitted.) But denial of registration is overkill.
 "(T)he critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not." (Citation omitted.) There is no evidence that GAS is an organization devoted to carrying out illegal, specifically proscribed sexual practices. While Virginia law proscribes the practice of certain forms of homosexuality, Va.Code § 18.2-361, Virginia law does not make it a crime to be a homosexual. Indeed, a statute criminalizing such status and prescribing punishment therefor would be invalid. (Citation omitted.)
 It follows that even if affording GAS registration does increase the opportunity for homosexual contacts, that fact is insufficient to overcome the associational rights of members of GAS. Given the right to exclude individuals who are convicted of practicing proscribed forms of homosexuality, or whose homosexual conduct, although not proscribed, materially and substantially disrupts the work and discipline at VCU, the suppression of associational rights because the opportunity for homosexual contacts is increased constitutes prohibited overbreadth. (Citations omitted.)
 Gay Alliance of Students v. Matthews, 544 F.2d 162, 166 (4th Cir. 1976).
 Chief Judge Coffin similarly wrote for the First Circuit:
 Another interest asserted by appellants is that in preventing illegal activity, which may include "deviate" sex acts, "lascivious carriage", and breach of the peace. . . . Mere "undifferentiated fear or apprehension" of illegal conduct, Tinker v. Des Moines Indep. Community School Dist., 393 U.S. (503) at 508, 89 S.Ct. 733, (21 L.Ed.2d 731) is not enough to overcome First Amendment rights and speculation that individuals might at some time engage in illegal activity is insufficient to justify regulation by the state.
 Gay Students Org. of Univ. of New Hampshire v. Bonner, 509 F.2d 652, 661-63 (1st Cir. 1974).
 
 
 [10]
 Defendants urge that this court must apply the clearly erroneous rule and sustain the district court's credibility assessment of conflicting testimony in view of the fact that there is substantial evidence supporting the court's finding. We reject this approach for several reasons. First, this court is not bound by the district court's credibility evaluation of witnesses where the evidence is submitted by deposition or in other documentary form. See Frito-Lay, Inc. v. So Good Potato Chip Co., 540 F.2d 927, 929-30 (8th Cir. 1976). Second, even under the clearly erroneous rule, this court has a greater latitude of review than it would in an appeal from a jury verdict. "In the latter it is a question of substantial evidence. In the former, there is still the qualitative factor of the truth and right of the case the impression that a fundamentally wrong result has been reached." Oil Screw Noah's Ark v. Bentley & Felton Corp., 322 F.2d 3, 5-6 (5th Cir. 1963). See also United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Finally, the critical question is not purely factual, but rather is closely intertwined with legal considerations. The inquiry is not merely whether certain events will occur, but rather, whether imminent lawless activity is so likely as to warrant infringement of First Amendment rights
 
 
 [11]
 Of further significance is the fact that recognition of Gay Lib is not determinative of whether its members will be allowed to meet or associate, but only of whether the group may use school facilities and become eligible for student activities funds
 
 
 [12]
 In one sense, although acknowledging the outstanding professional credentials of defendants' psychiatrists, their combined testimony stands on no different footing than the school authorities in Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), who were most knowledgeable on the pattern of student behavior in school, and who testified that in their opinion schools were no place for demonstrations. Yet the Supreme Court observed:
 The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands. But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, Terminiello v. Chicago, 337 U.S. 1 (69 S.Ct. 894, 93 L.Ed. 1131) (1949); and our history says that it is this sort of hazardous freedom this kind of openness that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.
 393 U.S. at 508-09, 89 S.Ct. at 737.
 
 
 [13]
 The Supreme Court has variously defined the nature of the requisite showing as follows. In Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919), Mr. Justice Holmes, writing for the Court, stated:
 The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.
 In Dennis v. United States, 341 U.S. 494, 510, 71 S.Ct. 857, 868, 95 L.Ed. 1137 (1951), the Court adopted Judge Learned Hand's statement that:
 In each case (courts) must ask whether the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.
 In Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969), the Court stated:
 (T)he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.
 
 
 [14]
 The Supreme Court has long adhered to the principle that any system of prior restraint of expression bears a heavy presumption against its constitutional validity. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); Heller v. New York, 413 U.S. 483, 491-92, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973); New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Carroll v. Princess Anne, 393 U.S. 175, 181, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); Freedman v. Maryland, 380 U.S. 51, 57, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). See also Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). In Southeastern Promotions, Ltd. v. Conrad, supra, the Court further stated that: "The presumption against prior restraints is heavier and the degree of protection broader than that against limits on expression imposed by criminal penalties." 420 U.S. at 558-59, 95 S.Ct. at 1246
 
 
 [15]
 The numerous decisions in which the Supreme Court has found an insufficient basis for abridging First Amendment rights in a variety of contexts are instructive of the heavy burden which defendants must satisfy here. See Hess v. Indiana, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (words advocating illegal action at some indefinite future time or having only a tendency to lead to violence insufficient); Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (fear of violent public reaction to wearing of jacket bearing profane epithet on the draft insufficient); Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (mere public intolerance or animosity insufficient; Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) (words not so inherently inflammatory as to come within "fighting words" doctrine insufficient); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (hostility to assertion or exercise of constitutional rights insufficient); Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (stirring people to anger, inviting public dispute or bringing about condition of unrest insufficient); Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941) (interference with fair administration of justice not sufficiently likely); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (insufficient showing of clear and present menace to public peace and order). Compare Carroll v. Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) (speech interlaced with burgeoning violence may be sufficient); Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961) (teaching of forceful overthrow of government accompanied by directions as to type of illegal action to be taken or by conduct to render later illegal activity effective sufficient); Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951) (clear danger of disorder sufficient); Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (insulting or "fighting" words which by their very utterance inflict injury or tend to incite immediate breach of peace sufficient)
 
 
 [16]
 Surely, it is no longer a valid argument to suggest that an organization cannot be formed to peaceably advocate repeal of certain criminal laws. See Street v. New York, 394 U.S. 576, 591, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969)
 Chief Judge Markey of the Court of Customs and Patent Appeals, sitting by designation, concurred in Judge Winter's analysis in Gay Alliance of Students v. Matthews, supra, and cogently added:
 Consistent with the present decision, associations advocating any idea, any change in the law or policy of the general society, are as fully entitled to registration as is the plaintiff. Thus, associations devoted to peaceful advocacy of decriminalization or social acceptance of sadism, euthanasia, masochism, murder, genocide, segregation, master-race theories, gambling, voodoo, and the abolishment of all higher education, to list a few, must be granted registration, upon proper application and indicated compliance with reasonable regulations, if VCU continues to "register" associations.
 It is of no moment, in First Amendment jurisprudence, that ideas advocated by an association may to some or most of us be abhorrent, even sickening. The stifling of advocacy is even more abhorrent, even more sickening. It rings the death knell of a free society. Once used to stifle "the thought that we hate," in Holmes' phrase, it can stifle ideas we love. It signals a lack of faith in people, in its supposition that they are unable to choose in the market place of ideas.
 544 F.2d at 167-68.
 
 
 [17]
 Would defendants allow a group of heterosexual students to meet to discuss the problems of homosexuals and the repeal of the sodomy laws? Presumably so, since there would be no basis to "infer" that the compulsive behavior of the students would incite violations of the law. However, assuming this to be so, it is obvious that equal protection principles become more sharply focused. See Gay Alliance of Students v. Matthews, supra
 
 
 [18]
 In view of our holding, we need not consider plaintiffs' equal protection claim